815 F.2d 76
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cathy COX, Widow and Administratrix of the Estate of Bobby
E. Cox, Jr., deceased, Plaintiff-Appellee,
v.
UNITED STATES of America, Defendant-Appellant.
 No. 85-5387.
 United States Court of Appeals, Sixth Circuit.
 Feb. 24, 1987.
 
 Before KENNEDY and RYAN, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 RYAN, Circuit Judge.
 
 
 1
 The government appeals the trial court's judgment that the United States is liable to the plaintiff for damages of $98,298.26 for the malpractice of its agents in failing to properly treat plaintiff's decedent, Bobby Cox, for his kidney condition, thereby causing his death. Defendant argues we should reverse the district court's judgment because it erred in finding: (1) that the Veterans Administration Hospital of Lexington, Kentucky was negligent in its treatment of Cox; (2) that Cox's failure to dialyze proximately caused his death; and (3) that Cox was not contributorily negligent. We conclude that the district court's finding that the hospital was negligent in its treatment of Cox is clearly erroneous and we reverse.
 
 
 2
 * Plaintiff's decedent, Bobby Cox, suffered from chronic end-stage renal disease, which means that his kidneys had failed. Ordinarily, this disease is treated in one of three ways: a kidney transplant, hospital outpatient dialysis, or "home training" dialysis. Cox had received a transplanted kidney; however, his body rejected the new organ. He then underwent outpatient dialysis for several years. Dissatisfied with the need to make a 100-mile trip to the hospital three times a week, Cox requested, and was admitted to "home training" dialysis.
 
 
 3
 Dialysis is a process by which a patient's blood is drawn out of the body and passed through needles and tubes into a dialysis machine. The machine cleanses the blood of impurities, including toxic levels of sodium, potassium, and other chemicals and fluids. After the blood is filtered through the machine, it is returned into the body. "Home training" dialysis describes the process by which a patient learns how to dialyze himself. The patient sets up his machine, prepares himself for treatment, and inserts into his body the needles that are attached to the tubes which in turn lead to the machine. The home training dialysis regimen begins in the hospital; after the patient becomes familiar with the procedure and obtains his own dialysis machine, the patient dialyzes at home with the help of a "backup" person.
 
 
 4
 Cox began home training dialysis at Cabell-Huntington Hospital in Huntington, West Virginia. His wife, Cathy Cox, became his "backup." A home training patient's "backup" is a person who helps the patient hook up to the machine at home. Mrs. Cox had been to the hospital to serve as her husband's backup on three occasions. On April 30, 1979, Cox transferred from Cabell-Huntington Hospital to the Veterans Administration Hospital in Lexington, Kentucky. At the V.A. Hospital, Cox dialyzed three times a week: Monday, Wednesday and Friday. He was scheduled to be in the dialysis unit at 7:00 a.m. on his treatment days. Throughout his training, Cox learned about the functions of the dialysis machine, the importance of dialyzing three times a week, and the extreme dangers of missing his dialysis treatment or violating his diet.
 
 
 5
 On Sunday, May 27, Cox and his wife had an argument. He ordered his wife out of the house and told her she would no longer serve as his home training backup. The next day, Monday, May 28, Cox and his brother Marty went to the Veterans Hospital for Bobby's next scheduled dialysis treatment. Marty had agreed to become his brother's new home training backup. At 8:00 a.m., Cox entered the dialysis unit. He was, as the trial court put it, "recalcitrant and uncooperative." He sat down in the chair where he normally would be dialyzed, and went to sleep with his coat over his head. When approached by Phyllis Horn, one of the dialysis nurses, Cox stated: "I have quit home training." Horn asked Cox to set up his machine which required that he prepare the dialysate liquid mix. He refused to set up his machine. Horn testified that Cox would not permit her to conduct a physical examination of him; she did make a visual assessment of him and found nothing wrong or unusual. She informed Dr. McMorrow of Cox's intransigence. McMorrow told her, "Leave the patient alone." She testified that she understood the doctor's instruction to mean that she was "not to agitate him; keep him in the condition he was so Dr. McMorrow could see him" when the doctor came by on his rounds. She testified that Cox never asked her to set up the machine for him, and that Dr. McMorrow said nothing to Cox.
 
 
 6
 Another nurse on duty, Bonnie Kelly, substantiated Horn's testimony that Horn tried but failed to convince Cox to set up his machine. She testified that Dr. McMorrow spoke to Cox, but that she didn't know what was said. She also testified that no one refused to treat Cox, and that Cox never asked her to hook up the machine for him.
 
 
 7
 Dr. McMorrow testified that Cox was unwilling to make the preliminary preparations for the dialysis. McMorrow spoke with Cox; however, he didn't "remember the specific interchange between us other than to the effect that if he was--had to set up his own machine that he would choose not to do dialysis that day." Dr. McMorrow did not think that in missing one day's dialysis, Cox's life would be threatened. He also testified that he had not refused Cox any treatment, and that Cox had never requested treatment on an outpatient basis.
 
 
 8
 Raymond Ng, who was the Head Technician in the dialysis unit, testified that he knew Cox well and had been to Cox's home to make sure the house was appropriate for home dialysis care. On Monday, May 28, he saw Cox in the dialysis unit at the hospital. The nurses told him Cox was refusing to set up and attach himself to the machine. He spoke to Cox, who was, at the time, lying on his side with his head covered. Ng offered to help Cox set up the machine but was told by Cox to leave him alone. Ng testified:
 
 
 9
 "And so I went over and talked to Bobby and at that time he was lying on his side with his head covered up and I offered Bobby to help him to set up the machine and get on the machine; and Bobby told me to leave him alone; and I talked to him a little bit more. I told him that he needed his dialysis and that I would just do whatever I needed to do to help him get on the machine. And he threw his cover back and told me that, 'it's my life; why are you concerned?' and I told him, 'I am concerned,' is why I was there talking to him.
 
 
 10
 "And after I talked to him a little bit more, I asked him why he did not want to get on the machine and he finally told me that he had just ran his wife out of the house. And I kept on telling him, 'let us get the machine together and let's get on the machine.' And he told me to leave him alone."
 
 
 11
 Ng testified that Cox never asked Ng to set up the machine for him and, in fact, refused to permit Ng to help him do so. Doctor McMorrow had given instructions to the nurses that Cox could either hook himself up to the machine or go home. After sitting in the dialysis chair for one and one-half hours, Cox left the hospital and went home. There is testimony in the record that Cox had missed one of his thrice weekly treatments on at least four prior occasions.
 
 
 12
 Several hospital staff members testified that they did not understand Cox's refusal to set himself up to mean that he was quitting all dialysis. Rather, they understood that Cox was merely refusing to set himself up on home training dialysis. The testimony indicates that the staff members did not offer to attach Cox to the machine as an outpatient procedure because they did not have the authority to do so. Cox did not ask to be set up on an outpatient basis, and persisted in his refusal to set up his own machine.
 
 
 13
 Plaintiff argues that the absence of charts or "workup papers" for Cox on May 28 corroborates her claim that Cox was not given the option of outpatient dialysis treatment. However, the testimony showed that it is not unusual that no workup papers be prepared for a patient who refused dialysis.
 
 
 14
 Mrs. Cox testified that she had been with her husband most of the time between May 28 and May 30 and that, to her knowledge, her husband had eaten only one sandwich. Cox had gone out briefly with his brother Marty on the evening of May 28. Marty testified that during that period Cox did not eat anything. Doctor McMorrow testified that he believed that Cox must have failed to abide by his diet, and had not eaten enough. According to Dr. McMorrow, by not following his diet Cox caused his body to metabolize muscle tissue which released large amounts of potassium into his bloodstream.
 
 
 15
 Cox's brother Marty testified that when he was with Cox on Tuesday, May 29, the decedent was growing weaker and "seemed sick." Marty asked Cox if he wanted to go to the hospital and Cox replied that he did not. Cox spent most of Tuesday morning and afternoon in bed. Toward late afternoon, Cox and his wife went to Cox's mother's house. They returned home around six or seven o'clock in the evening.
 
 
 16
 The following morning, Wednesday, May 30, Cox apparently woke up at about 10:30 a.m. He had been scheduled to be at the V.A. Hospital at 7:00 a.m. for his regular home training dialysis treatment. Mrs. Cox, fearing that her husband needed treatment but was not going to get it, began making telephone calls to obtain transportation to convey Cox to a hospital. She testified that their car was not working properly and that her husband convinced her that their car would not make it to Lexington. After several phone calls to Wanda Peddicord, Cox's nurse, the substance of which is disputed, Mrs. Cox finally found an ambulance company which would take Cox to the local hospital. By this time, Cox had gone into convulsions and was being attended to by his brother Marty. Cox arrived at Kings Daughters Hospital at about 12:30 p.m., where he expired. The immediate cause of death was determined to be cardiac arrest due to hyperkalemia caused by chronic renal failure. Hyperkalemia is a condition caused by potassium overload; potassium builds up in the blood due to a patient's missing dialysis or not following his diet.
 
 II
 
 17
 Adopting the liability findings of an advisory jury, the district court found the government liable for the negligence of its medical personnel at the Veterans Hospital, and found Cox not contributorily negligent. The government challenges both of these findings. Because we find the district court's conclusion that the hospital personnel were negligent to be clearly erroneous, we need not reach the contributory negligence issue.
 
 
 18
 The fact that the trial court's findings followed those of an advisory jury does not affect the standard of appellate review. The advisory jury's findings are not binding and can be totally disregarded. Wynn Oil Co. v. Purolator Chemical Corp., 536 F.2d 84 (5th Cir.1976); see also Jungmann v. St. Regis Paper Co., 682 F.2d 195 (8th Cir.1982). Our standard of review of a trial court's fact-findings in Federal Tort Claims Act[1] cases is the clearly erroneous standard and "[w]e judge a trial court's finding to be clearly erroneous when, after reviewing the entire evidence, we are 'left with a definite and firm conviction that a mistake has been committed.' " Ferrero v. United States, 603 F.2d 510, 512 (5th Cir.1979) (quoting United States v. United States Gypsum Co., 333 U.S. 364, 395, 29 L.Ed. 746 (1948)). See also Hartzell v. United States, 539 F.2d 65 (10th Cir.1976).[2]
 
 A.
 
 19
 The district court found that the hospital personnel were negligent in two respects: (1) failing "to counsel with Bobby at a time when, as the hospital knew or should have known, Bobby was extremely emotionally upset, and (2) failing to measure Cox's blood pressure, pulse and weight and prepare the appropriate paper work up on him." In support of these findings, plaintiff's counsel argues before us that the hospital personnel owed decedent a duty to treat his psychological as well as his physical needs and, in view of the circumstances, were obligated to perform outpatient dialysis on him.
 
 
 20
 In Kentucky, whose law is applicable in this case, " '[a]ctionable negligence consists of a duty, a violation thereof, and consequent injury. The absence of any one of the three elements is fatal to the claim.' Illinois Central Railroad v. Vincent, Ky., 412 S.W.2d 874 (1967)." M & T Chemicals, Inc. v. Westrick, 525 S.W.2d 740, 741 (Ky.App.1974). The elements of a negligence claim in Kentucky are 1) a duty, 2) a breach of that duty, 3) injury proximately resulting therefrom, and 4) damages. Helton v. Montgomery, 595 S.W.2d 257 (Ky.App.1980).
 
 
 21
 The trial court's primary basis for finding the hospital staff negligent was its failure "to counsel" Cox when he refused to participate in the home training dialysis procedure. Doctor Kinney, plaintiff's expert, testified, on direct examination, that when faced with Cox's refusal to set up the machine, the V.A. doctors were required to meet the following standard of care:
 
 
 22
 "Well, ordinarily, we don't turn it into a confrontation and absolute decision process with an either/or; we try to work out what's bothering the patient, or put the bother aside for a while and do whatever is necessary to give him care.
 
 
 23
 "Often, we'll sit down and talk with the patient and find out what the devil is going on."
 
 
 24
 Doctor Kinney was then asked whether the treating physician of a hemodialysis unit has a "responsibility to attend to the psychological and psychiatric problems involved in [the patient's] hemodialysis." He answered: "Yes, sir. Depression is a very common problem especially in dialysis." This was the only testimony establishing what standard of care the hospital had to meet relating to counseling a dialysis patient. The court was therefore bound to determine negligence from this duty, as Kentucky leaves the standard of care to the professionals, not the courts, and expert testimony must establish the standard. Blair v. Eblen, 461 S.W.2d 370 (Ky.1970); Maggard v. McKelvey, 627 S.W.2d 44 (Ky.App.1981). See also Illinois Central R.R. Co. v. Swift, 233 F.2d 766 (6th Cir.1956). The district court interpreted this testimony to mean that the staff had a duty to counsel Cox and, in failing to do so, breached their duty to him which resulted in Cox's decision to leave the hospital without having had dialysis, which, in turn, proximately caused his death. We respectfully disagree and hold that the district court's finding that the hospital personnel were negligent in failing to counsel the decedent is clearly erroneous.
 
 
 25
 Neither the trial court nor plaintiff's attorney specified the details of the counseling to which the decedent is said to have been entitled. The record shows, however, that Raymond Ng did counsel the decedent and, in the counseling, told Cox that he "needed his dialysis" and that he, Ng, was concerned for him. In an effort to find out "what the devil is going on," as Dr. Kinney put it, Ng "talked to [Cox] a little bit more [and] asked him why he did not want to get on the machine." Cox replied "that he had just ran his wife out of the house." Despite Ng's offer to "help him set up the machine and get on the machine," and "[to] just do whatever I needed to do to help him get on the machine," Cox refused Ng's help and stated "it's my life, why are you concerned?" Finally, Cox "told [Ng] to leave him alone." Ng's explanation to Cox that he needed his dialysis, and Ng's attempt to discuss with Cox the reasons for his refusal to participate in home training dialysis, was counseling intended to comfort Cox and to persuade him to undertake, with Ng's assistance, the measures Cox knew were necessary for his health. Therefore, the hospital's duty to counsel the decedent, as defined by the plaintiff's expert, Dr. Kinney, was fulfilled by Technician Ng.
 
 
 26
 Plaintiff claims, apparently as an aspect of the district court's "failure to counsel" finding, that defendant's personnel were negligent in failing to perform outpatient dialysis on the decedent. She makes the claim despite the fact that the V.A. Hospital had no agreement with the decedent to perform outpatient dialysis on him, had never done so previously, and were not asked to do so on the occasion in question.
 
 
 27
 Asked by plaintiff's counsel why Technician Ng did not "try to force [Cox] to get on the machine," Ng stated:
 
 
 28
 "Well, dialysis is in such a way that you really cannot force somebody to get on the machine for the simple reason, you have a very small vessel--about the size of a pencil or so--that you have to put in the size of a needle, (which is) equivalent of a toothpick. Unless the patient is cooperative, you cannot initiate dialysis. The only way you can do it is to hog-tie him down or just give him medication to knock him out and then administer dialysis. We did not take those steps."
 
 
 29
 Manifestly, Bobby Cox had a right to his privacy and a right to be free from coercion by the hospital staff--to be left alone--and the hospital personnel had a duty to treat the decedent with dignity. 38 C.F.R. Sec. 17.34(a)(1) (1986). Therefore, the staff of the V.A. Hospital had neither a right nor a duty to coerce Cox to dialyze. In respecting Cox's wishes to "leave him alone," and declining to force Cox to dialyze, the hospital personnel were not guilty of negligence.
 
 B.
 
 30
 The district court also found that the hospital staff negligently failed to measure Cox's blood pressure, pulse and weight, and prepare the "paper workup" of that information. To be actionable, that failure must have been the breach of a duty owed Cox by the hospital staff that proximately caused Cox's death. In this case, there is no evidence to show either that the hospital owed Cox a duty to conduct those tests and to do a "paper workup," or that the failure to conduct the tests or do a paper workup were a proximate cause of the death. There was no evidence that a paper workup would have succeeded in getting Cox to dialyze. Rather, the evidence showed that it was not unusual for the staff not to take the blood pressure, pulse, and weight of a patient refusing dialysis. Further, it is uncontradicted that Cox refused to allow Nurse Horn to perform even a brief physical examination of him. When Cox insisted that Horn and Ng "leave him alone," the hospital was obligated to respect the privacy and dignity of its patient and not force him to undergo an unwanted physical examination--a necessary prerequisite to preparing a paper workup. Under the circumstances, the hospital staff breached no duty to measure Cox's blood pressure, pulse, and weight and to prepare a paper workup recording such information, and the district court's finding to the contrary is clearly erroneous.
 
 
 31
 The judgment of the district court is vacated, and the case is remanded to the district court with instructions to enter judgment for the defendants.
 
 
 32
 CELEBREEZE, Senior Circuit Judge, concurring.
 
 
 33
 I concur in the majority's holding that the staff of the Lexington Veterans Administration Hospital did not negligently fail to counsel Bobby Cox Sr., on May 28, 1979.[1] However, the majority identifies a standard of care which I find to be inconsistent with the standard actually applied by the district court. I therefore conclude that the majority has omitted an important step from its analysis and write separately to fill that void.
 
 
 34
 The majority concludes that the district court imposed on the Hospital a "duty to counsel" Cox when Cox announced his desire to quit the home-training dialysis program. Although this interpretation of the standard of care is plausible, I believe that the district court's opinion, when read in its entirety, reveals that the lower court actually imposed a more stringent duty. In the district court's words:
 
 
 35
 The hospital staff could, and the Court believes did, talk to Bobby and tried to persuade him not to quit home training. But, failing that, the hospital should have respected Bobby's choice and attempted to set him up as though he was on regular outpatient treatment.
 
 
 36
 Joint App. 26 (district court opinion). Thus, I conclude that the district court imposed on the hospital not only the duty to discuss Cox's situation with him, but also the duty to offer to dialyze Cox on an outpatient basis once the Hospital staff ascertained that Cox was resolute in his desire to quit the home-training program.
 
 
 37
 Although this more stringent standard of care might appear appropriate under the circumstances of this case,[2] Kentucky law requires that the standard of care be established by medical expert testimony, not by the courts. See Blair v. Eblen, 461 S.W.2d 370, 373 (Ky.1970). The expert testimony adduced at trial, however, does not support the district court's conclusion that the Hospital had a duty to offer dialysis to Cox on an outpatient basis. The experts testified only that the Hospital staff should have counselled with Cox in an effort to assure his psychological, as well as physical, well-being. In my view, therefore, the district court clearly erred in imposing this unsupported "duty to offer" as the standard of care, and not, as the majority holds, in finding that the hospital staff breached the less stringent "duty to counsel."
 
 
 38
 In some circumstances application of an erroneous standard of care requires remand to the district court for application of the correct standard. See, e.g., Complaint of Paducah Towing Co., 692 F.2d 412, 427 (6th Cir.1982). However, when the record supports a finding of only one standard of care, and application of that standard to the facts as previously found by the district court is uncomplicated, remand is unnecessary. Cf. United States Steel Corp. v. Fortner Enterprises, Inc., 429 U.S. 610, 612 n. 1 (1977) (remand to Court of Appeals unnecessary because record provided sufficient basis for decision); Mowery v. Heckler, 771 F.2d 966, 973 (6th Cir.1985) (remand to Secretary of HHS unnecessary where "adequate record" shows benefits should be awarded).
 
 
 39
 In this case, the only standard of care that the expert testimony supports is the "duty to counsel" which the majority identifies. I agree with the majority that Technician Ng discharged the Hospital's "duty to counsel" when Ng engaged Cox in a discussion "intended to comfort Cox and to persuade him to undertake, with Ng's assistance, the measures Cox knew were necessary for his health." Because the appropriate standard of care was not violated, the Hospital staff could not have been negligent. I therefore concur.
 
 
 
 [1]
 28 U.S.C. Sec. 1346(b)
 
 
 [2]
 Appellant's point out that under Walter v. CIR, 753 F.2d 35, 38 (6th Cir.1985), although the findings of fact in a bench trial are subject to the clearly erroneous standard, "[f]indings of ultimate fact which result from the application of legal principles to subsidiary facts are subject to de novo review."
 
 
 [1]
 I also agree with the majority that the Hospital's failure to complete a paper work-up on Cox does not constitute negligence
 
 
 [2]
 The record discloses that the Lexington V.A. Hospital had approved Cox for outpatient dialysis treatment, and had treated Cox as an outpatient for several years before he opted for the home-training program. The majority's assertion that the Hospital had never previously dialyzed Cox on an outpatient basis is incorrect. Nurse Peddicord, Cox's "primary" nurse, testified that Cox received dialysis at Lexington V.A. Hospital from 1975, when his body rejected the kidney transplant, until January, 1979. In addition, the majority's conclusion that the Hospital staff "did not offer to attach Cox to the machine as an outpatient procedure because they did not have the authority to do so" is not supported by the record. The only testimony concerning authority was given by Phyllis Horn, the attending nurse, who stated that she did not have the authority to take Cox off the home-training program. This testimony does not lead to the majority's conclusion that none of the staff had the authority to treat Cox as an outpatient. In particular, it would be quite surprising if Dr. McMorrow, the attending physician, did not have such authority if he thought that the change was medically necessary. Thus, when Cox announced his decision to quit home training, it would not have been burdensome for the Hospital to offer to reinstate Cox on outpatient dialysis